**UNITED STATES DISTRICT COURT**
**for the EASTERN DISTRICT of NEW YORK**

| | | |
|---|---|---|
| UNITED STATES of AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | **Docket No. 10-CR-991 (JS)** |
| | ) | |
| Jose Alejandro CASTILLO-MEDINA, | )          ) | |
| | ) | |
| Defendant. | ) | |

_____

**DEFENDANT'S SENTENCING MEMORANDUM**

### I.    Introduction.

The Defendant is a thirty-eight year old Canadian national, and one-time teenage refugee from Honduras, re-settled in Quebec.  He has pleaded guilty, accepts responsibility for, and stands convicted in the crime at bar of a single count of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(D), Conspiracy to Distribute and Possess with Intent to Distribute Marijuana.  Jose Castillo-Medina has no prior criminal record; his adult history since immigrating to Canada has consisted largely of getting the basic education he missed as a child in Honduras, learning French, waiting tables and washing dishes, and saving money to develop his own custom auto accessories business.  He is married, without children, and has struggled considerably with alcohol and marijuana abuse in his thirties.  While the Pre-Sentence Investigation Report (hereinafter, "PSIR") describes the Defendant's criminal conduct in this case, and his personal and family history, the instant submission addresses these considerations in greater detail, to

provide the Court with a fuller basis upon which to fashion a reasonable sentence.  Thus, this memorandum takes issue with the PSIR's characterization of Mr. Castillo-Medina as a "supervisor" in the crime at bar, and the concomitant 3-point upward enhancement therefore; it confronts the PSIR's assertions regarding unproven allegations as to Mr. Castillo-Medina; and it provides an in-depth background narrative of his compelling personal life, so that the Court may weigh this Defendant in the light of §3553 considerations.

## II.    Defendant's Personal and Family Background.[1]

Jose Alejandro Castillo-Medina is the first-born child of Jose Castillo, a one-time career soldier in the army of Honduras, and Rosa Medina, a clerical worker; he was born in 1973 in Tegucigalpa, the capital of Honduras.

The Defendant's family has generally consisted of military men serving as common soldiers in the ranks, from the time of the labor and peasant unrest of the 1950's, through the Defendant's own hitch in the army at age seventeen, and continuing with various of his relatives, through the present army struggle in Honduras with narco-traffickers and criminal gangs. Following an officer's coup against the elected government in 1961, an unbroken line of military dictatorships ruled the country for the next twenty years.  In typical Central American fashion, the army provided the sole institutional means of securing employment for young men in Honduras, and the Defendant's own family on both sides proves the rule.  The Defendant's father Jose Castillo had very little formal education, and joined the Honduran army at age sixteen in the 1965.  Compulsory military service conscripted teenagers into the ranks; some, like the men in the Defendant's family, stayed on for careers.  Jose's uncle Victor Castillo rose to an non-commissioned officer's level, and would see combat action in the four-day war against El

---

[1] The information  provided herein is based upon counsel's discussions and investigations with the Defendant and his family, discovery, and upon materials maintained in the case file.

Salvador in 1969—the notorious "Soccer War," fought the summer of a World Cup qualification playoff between the two nations; the same uncle would later be arrested and charged with running an arms-smuggling network in the 1990's, and went to prison in 2000, serving a five-year sentence.   Other uncles and cousins rose through the ranks to become officers; several still serve today.  Even the Defendant's mother worked as a secretary to an army commander.  Jose's own father finished his draft service and re-enlisted in the year of the war, ultimately to serve well into his thirties; when a criminal bank robbery gang run from within the army planned and executed a series of heists in the capital in the early 1980's, the elder Jose Castillo was implicated, and jailed for two years, before being drummed out of the military.

Tegucigalpa's barrio neighborhoods are among the oldest and most densely-populated in Central America, with urban poverty on a scale not seen in the cities of North America.  The Castillo family lived in the barrio just east of the airport, where many army families lived—enlisted military service in the 1970's guaranteed an income of 200 lempira per month, the equivalent of about twenty dollars, plus soldiers were fed daily.   One of the worst slums in all of Latin America, the barrios of east and southeast "Tegus" teem with cinderblock-style huts and shed-housing, thrown up in improvised fashion, and ringed by squatter encampments in the *barrancas*, or shanty-towns.  Jose recalls that he lived with his parents—and his younger siblings, Gabriela and Leonardo—in a cinder-block single-room house with a corrugated tin roof, dirt floors, and cold water plumbing by means of a rubber hose.  Rooms within the block house were improvised by hanging sheets; while they had electricity, it consisted of a single light-bulb socket hanging in the middle of the room, from which they ran adaptors and cords, with urban blackouts at least once a week as the norm.

Jose reports that his father was a brutal man, given to few words, and prone to using his fists and belt to punish his children and wife at every perceived transgression.  He drank as much as a bottle of rum every other day, and was surly and irritable at all hours.  As a military man, he insisted on a regimental subordination, and anything out of place—an unwashed pot, or an unmade bed—would inspire savage fits of temper and beatings.  As Jose would later learn when he enlisted in the Army, physical violence was a military tradition, and his father carried this model to the home—Jose remembers beatings with a belt so severe he could not walk for a day. He also witnessed his drunken father punch and kick his mother and sister routinely—the latter throughout her puberty and adolescent years, and he remembers his mother getting a black eye or split lip from his hand often enough to sear the images in his mind.  Jose especially remembers a time shortly before the family moved to Canada when his mother confronted his father about his girlfriend, and received a sustained beating in front of the kids that left her terrorized and numb. Powerless and looking to escape both his father's alcoholic violence and the spectacle of his mother's near-daily hazing, Jose ran away from home repeatedly during his pre-teen and teenage years, and lived on the streets or at the local bus station for days at a time, or hide at the homes of his cousins.  Invariably, when sent home by police or relatives, he received a harsh beating from his father.

After his father served a jail sentence and lost his military job, he worked as an exterminator, killing rats and roaches at the barrio marketplace—a desperate job at the bottom of the social order, only one step above begging in the streets.  Jose's mother still worked part-time as a clerical worker, and her income became the family's main means of support.  During the late 1980's, the family grew increasingly impoverished, as the elder Mr. Castillo struggled to make any income.  The idea of emigrating in due course became the family's goal.

The Defendant dropped out of school in the middle of tenth grade, at his father's insistence, to join the army—Jose's father believed that they might try their luck in another country soon, and because Jose was now sixteen, he did not want the Government to draw the inference that the young man was trying to avoid his compulsory two year hitch, in case the family had to return to Honduras.  In the army, corporal punishment was a way of life—Jose recalls humiliation and beatings without cause by sergeants, corporals and captains alike.  He lived with conscripts in open-air tents in all weather, completing his six months of basic training in weapons on the M-16 rifle, and endless marching and cleaning.  Jose gave his meager monthly army stipend to his mother, and as he neared the end of his enlistment, his family had arrived at a plan to move to Montreal, Canada, where an uncle had settled—Jose would later learn that his father had been working on a means of getting the family out of Tegucigalpa for some time.[2]

The Castillo family emigrated in 1990 to Quebec, joining a growing community of Central American immigrants around the Jean Talon market neighborhood—here, Hondurans, Salvadorenos, and Guatemalans formed a hardworking Latin niche within the francophone culture.  Sessa Castillo, a cousin, had already been in Quebec for some time running a bodega owned by a Peruvian, and Jose's mother quickly found work there while the newly-arrived Castillos  moved in with their cousins, living six persons to a two-bedroom apartment.  Jose secured a restaurant job, and began working as a busboy right away, and would never be unemployed a single day after his first week in Canada.  After six months, the family moved into a small apartment, as Jose's sister and brother enrolled in and finished their final years of high school, with all of the family members working jobs to pay the rent.

---

[2] The Defendant believes that superior elements of the army paramilitary gang which had not been convicted for the bank robbery conspiracy had made threats against the elder Jose Castillo believing he had cooperated in their prosecution; on the basis of these fears, the Defendant's father sought and was granted a refugee status visa for himself and his family that year.

Only a year after arriving, however, Jose's father fell afoul of the law, when his temper and alcohol-fueled violence came to the attention of police. The Defendant's sister Gabriela, then sixteen years old, wore shorts to her after school cashier job one day at a local grocery store—her father took out his anger over her "immodesty" by beating her bare back and shoulders with a belt. The next day she showed the welts and bruises to a guidance counselor at the high school, and social services was immediately summoned. Gabriela never went home again; the resulting family court intervention placed both minor children in foster care. When the elder Mr. Castillo told the family court judge—with his children and wife present in court— that  he could  beat his children "whenever he wanted to," the matter was referred to criminal court, which charged Jose's father with assault. As a result, Jose's father was deported from Canada in 1992 for his conviction; Gabriela and Leonardo finished high school, living in foster homes; and Jose, being eighteen years old, was offered a temporary residency card and lawful immigration status, eventually becoming a naturalized Canadian citizen in 2001. Rosa Medina left Canada with her husband; although the Defendant has not spoken with his father in more than ten years, and has had scant contact with his mother, he believes his parents are living in southern California at this time.

Jose Castillo-Medina enrolled in College Français de Montréal at age eighteen, to learn French and achieve a general degree equivalent to the standard *lycée* or high school level of academic basics; he focused on math and sciences. While completing his one year course, he attended classes full-time by day, and worked restaurant jobs each night from evening well past midnight, and over the next ten years would work in various capacities at pizza parlors, delis, and better restaurants in the old quarter of Montreal, such as Nicholls and Au Vieux Duluth. Jose worked as a kitchen helper at first, then busboy, and eventually as a waiter in the tourist

spots downtown, where tips were reliable.  Within ten years, he was a head waiter at the upscale bistro Vargas, a prestigious Montréal steakhouse in the nightlife and university district.  While working at a restaurant in 1993, he met Jessica Legg, a waitress and student,  and after dating a year, they married in 1995.   A native Anglo-Quebecoise, Ms. Legg's father worked in construction; she has been employed by the clothing company Diesel in Montreal for more than twenty years, as a retail supervisor at its various locations.  Ms. Legg filed for divorce from her husband shortly after his arrest in the events at bar, and will finalize the divorce upon his release and return to Canada.

Jose Castillo-Medina has worked steadily throughout his adult life and has founded two viable businesses in the automobile servicing and accessories field.  Waiting tables at Restaurant Vargas, Jose earned more than CAD$1,500 per week in tips, plus his payroll wages—he estimates that by 2001 his annual income was approximately CAD$75,000.  After saving more than CAD$10,000 from his tips as a waiter over a ten-year period, Jose invested in a car wash and detailing business, Lave Auto Prestige (Prestige Car Wash), also known as "Autoplex." After incorporating, Jose's initial investment went to building rental expenses, leasing equipment such as a pressure pump and heat-cleaning machines, and some $3,000 in Car-Brite products. Within a few months, he had eighteen workers on the payroll, employing mostly Central Americans and young Quebecois, providing full-service detailing inside and out.  After a year in business, Castillo-Medina had secured contracts with several local dealerships, including Volkswagen, BMW, Subaru and KIA, to perform new car detailing—auto transporters coming from the Port of Montreal at Laval would bring new cars straight to Prestige for detailing before display and offering by dealers; Prestige earned CAD$240 per car, and had the ability to process fifty to sixty cars per month.   Mr. Castillo-Medina had possession of about twenty new cars at

any given moment, and carried CAD$2 million in insurance.  In addition, Prestige also did private detailing for select customers on high-end vehicles, developing a dedicated customer base among Montréal's custom car subculture, without benefit of any advertising, but simply by word of mouth among the auto-dealers and car collectors.  During this period, Jose also took product certification courses from different detailing and cleaning manufacturers, and undertook professional development in community college business class basics.

By 2004, Jose had decided that Autoplex had reached the limit of its natural growth as a business model; in preparing cars for an auto show at a convention center, he had made new contacts in the accessories and custom wheels market, and customers began asking for the expensive rims and wheel-sets.  Mr. Castillo-Medina rebranded his business as Prestige Wheels, and began devolving the wash and detail business—with its intensive employee oversight, water and power bills, and client management issues—onto a company he eventually sold.  The custom rim business, by comparison, was far easier to manage, with a better margin of profit: Jose had two full-time managers, an office and small warehouse for stock, phones, computers and accounts.  And the custom wheel business was more than lucrative—retail prices for a set of four chrome wheels often ran from CAD $15,000 per set to as much as CAD$40,000; inexpensive rims were CAD $2000 per wheel.   Prestige Wheels bought all of its stock from manufacturers in the United States—this line of products was the most highly sought-after by customizers and collectors, and nothing like it was made in Canada.  While this raised its own set of problems— shipping, customs, and banking—Prestige Wheels proved a quick success, grossing over one million CAD in its first two operating years, 2005-2006.

In 2006, Prestige Wheels did its first booth at eastern Canada's premier auto show, in the Olympic Stadium, bringing in custom cars with the company's finest selection of rims, and sales

girls to show off new accounts among the trade.  That year, Jose worked a number of smaller car shows in Ontario and Quebec, and opened a second location for the business in Terrebonne, by franchising the name and network to a partner, taking 5% of the gross.  In addition, he established an associated garage for mounting the custom rims, partnering to lease the $40,000 machine for balancing the widest 32-inch wheels.  Yet within a year, Jose's business could not keep up with demand—CAD $100,000 in retail stock-on-hand only amounted to rims for about ten cars cars, which was typically exhausted in a few weeks.  Many customers would place orders with Jose for rimsets, wanting immediate shipping, but Prestige found itself unable to deliver as it waited for its orders to be processed by stateside manufacturers and wholesalers.

When Jose went to banks in Montreal to secure small business loans to finance orders from US companies, the local banks rejected his business model, citing the luxury, niche-market reality of custom car rims, as well as vaguely alluding to the Defendant's lack of "roots" in the business community, which Jose took to mean the fact that he was not a white Quebec-native Francophone.  He did finance rim purchases through Wells Fargo, but at 29% interest, his profit margin eroded steeply—especially as his customs clearing fees increased in 2006—and he discontinued the practice of financing on credit.  Jose succeeded in establishing lines of credit with a couple US-suppliers, but terms required a minimum buy-in and thirty-day repayment. With each new season, he would purchase about CAD $100,000 in wheels in the latest styles, only to see all the stock gone in weeks.  In those cases where a customer placed a large order only to cancel later, the thirty-day line of credit could prove fatal, business-wise, as it almost did in Long Island in October of 2007, when the Defendant was returning two sets of custom rims to a New York supplier, and received his refund in cash, only to have the cash seized by DEA agents erroneously.  *See,* PSIR at ¶61, and discussion *infra* at §V, §§3.

By 2008, Prestige Wheels began to suffer the effects of the economic recession in Montreal, as sales on luxury items flagged, and the company showed a loss for the year. Jose re-doubled his efforts with advertising, putting approximately CAD $13,000 into web design, an online catalog, hosting costs, and print and media ad purchases; he sold rims on Ebay and Craigslist, as well. Yet in 2009, the company only broke even—car shows had become ineffective at generating sales, with booth fees typically topping CAD $4,000, and electrical, personnel and incidentals adding another CAD $12,000 to the cost of a three-day convention show—doing five shows that year, he saw little real return on the effort, only selling enough to cover costs. Prestige entered into contracts with Chrysler and Dodge dealerships to put rims on their show cars, or to sell as part of "style packages" at the dealerships, but the profits were slim, as the markup mostly went to the dealer. In searching for an investor to help him overcome the credit problem and build the business, Jose only entered into discussions with one dealer, a competitor, who really wanted to buy him out and close Prestige. He also sent his manager to the Las Vegas car exposition to generate new business, but the problem with fulfilling orders remained an impediment to success.

At the time of his arrest in the events at bar, Jose's business was barely solvent; upon information and belief, the manager of Prestige continued operating the business for a few months following Castillo-Medina's incarceration, only to liquidate the remaining stock, and close the accounts. It is believed that the Canandian government initiated a bankruptcy proceeding against Prestige Wheels, and the company is now defunct.

Jose Castillo-Medina intends to return to work as a waiter at Restaurant Vargas upon his release and return to Canada—he understands from contact with his sister that the management of the restaurant would eagerly restore him to his former job there. For the future, Jose has been

studying stone re-facing construction techniques and materials, and wants to start a construction business specializing in these techniques.

### III.  Defendant's Drug and Alcohol History.

During much of the last ten years, Jose Castillo-Medina has struggled with extensive marijuana use and alcoholism.  Beginning in his late teens, while working in Montreal kitchens, Jose began drinking with co-workers at the end of shifts, and smoking marijuana.  He reports that by the age of thirty, he typically ended each restaurant shift around midnight with four or five drinks at the bar, staying out late with other waiters and cooks in the time-honored driking and drugging traditions of second-shift restaurant work.  Jose drank rum almost exclusively, and continued this practice even after marrying Ms. Legg at age twenty-three, sleeping through the early afternoon before preparing for another shift.  In addition, he smoked marijuana regularly at home, much to his wife's displeasure.  By 2002, when he had left restaurant work to run his auto detailing business, Jose would wind down each night with as many as a dozen drinks, starting in early evening, and continuing well past midnight.  At Prestige, Jose worked sixty to seventy hours per week, and spent a significant amount of time after-hours with potential clients and car collectors, socializing at restaurants and bars.

His wife Jessica reports that their marriage began to suffer the strain of Jose's alcoholism around 2004 as she began to insist that he seek treatment, and he refused.  As Ms. Legg reached her thirtieth birthday, she also made clear to her husband her desire to have a baby, which he flatly refused, citing his own childhood as a disincentive, believing that parenting was a brutal and ugly affair.  Ms. Legg reports that her husband was not violent himself, but that the emotional toll of his violent upbringing had created a "disconnect" in him, through which he struggled to achieve intimacy, and often suffered from depression.  He drank to the degree of

"blacking out" almost weekly, and often did not come home at night, leaving his wife to wonder if he was alive or dead.  The toll of stress from his business seemed to multiply his determination to stay drunk night after night, sobering up only long enough to attend to the business, but never with any family time left over.  Though never violent, Jose's non-responsiveness in the grip of alcohol abuse made for a dysfunction leaving little room for progress.  As his alcohol consumption began to approach half a case of rum every week, she left him in 2004; a series of would-be reconciliations proved futile, and the couple effectively separated for good by 2006.

Jose Castillo-Medina has not been treated for his alcoholism beyond an aborted, voluntary participation in a clinic in 2008, which he attended only occasionally, while ignoring all the group and one-on-one therapy available.  While he remains untreated, his approximately sixteen months incarcerated in Queens awaiting sentence has shown him that he can live sober, and that with effort he can resume his life in Canada without drinking, but that he will need considerable help and therapy to do so.

**IV.   The Defendant Was Not a Leader, Supervisor or Manager in the Instant Offense**.

In the case at bar a dozen persons were charged with a conspiracy to possess and distribute marihuana throughout the Eastern District of New York during the period of March through November of 2010.  Insofar as the charges relate to Mr. Castillo, it is alleged that on a single occasion, November 16 2010, he possessed the equivalent of twenty to forty kilos of marihuana, based upon the amount of money seized from a co-defendant.  Although the Defendant reaffirms his guilt and accepts full responsibility for his limited role in the offense, he categorically denies that he was a leader, manager, or supervisor in it.  To the extent that the PSIR contains allegations of "fact" that suggest that Mr. Castillo was more than a passing participant in the offense, it is wrong.   To the extent that the PSIR suggests that Mr. Castillo

should receive an upward adjustment pursuant to U.S.S.G. §3B1.1 because he played an aggravating role in the offense, as that term is defined, it is likewise incorrect. For the reasons to follow the PSIR's suggested sentence calculus which includes a three-point increase for the Defendant's base offense level is mistaken and should be decreased accordingly.

In relevant part, under U.S.S.G. §3B1.1, a defendant's offense level may be increased 2, 3 or 4 levels if he occupied an aggravating role by serving as an organizer, leader, manager or a supervisor in a given offense. The extent of a particular upward adjustment is based upon the number of persons whom he oversaw or where his activity was "otherwise extensive." *See* §3B1.1 (a)-(c). As indicated in the Background section of the relevant Application Notes the . . . "[s]ection provides a range of adjustments to increase the offense level based upon the size of a criminal organization . . . and the degree to which the defendant was responsible for committing the offense." At their core, the increases are intended to further punish those who exercise supervisory or managerial roles in crimes as they "tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate."

Application Note 4 indicates the aggravating role adjustment does not depend on a defendant's title but rather factors such as the exercise of decision-making authority. *See*, *generally*, United States v. Blount, 291 F.3d 201 (2d Cir. 2002)(affirming supervisor increase for defendant who was in day–to-day charge of street sales for the drug operation). Likewise, in determining whether a role adjustment for a supervisory or managerial role is in order, the courts should consider the nature of the defendant's participation and his share of the "fruits" of the crime. *See, e.g.*, United States v. Greer, 285 F.3d 158 (2d Cir. 2002)(finding that the "real leaders or organizers" resided in Holland and Canada, after considering such factors as decision making authority, claims to proceeds, scope of activity and degree of control over others).

To be a "leader" the defendant must control others.  (*See*, United States v. Brown, 298 F.3d 120 (1st Cir. 2002) (defendant exercised authority over a co-conspirator); United States v. Carter, 300 F.3d 15 (4th Cir. 2002)(defendants were the principal suppliers to crack cocaine to street dealers); United States v. Reedy,  304 F.3d 358 (5th Cir. 2002)(defendant ran his company to market child pornography and actively recruited web masters by promising increased profits). To be an organizer one must coordinate others to facilitate the commission of the criminal activity.  (*See*, United States v. Picanso, 333 F.3d 21 (1st Cir. 2003)(wholesale drug dealer was organizer where others regarded him as the "king" and he boasted he could shut down a co-defendant's distribution if he "messed up again"); United States v. Matthews, 222 F.3d 305 (7th Cir. 2000 )(finding organizer role where defendant set the time and location and could set the prices); United States v. Placensia, 352 F.3d 1157 (8th Cir. 2003)(defendant possessed the authority to divert a shipment of drugs to another person when he became suspicious that law enforcement officers were watching).

To be a manager or a supervisor one must direct the activities of others. "A defendant acts as a 'manager or supervisor' of a criminal enterprise involving at least five participants if he 'exercise[s] some degree of control over others involved in the commission of the offense,' or 'play[s] a significant role in the decision to recruit or to supervise lower-level participants.'"  In United States v. Payne, 63 F.3d 1200, 1212 (2d Cir. 1995). (*cf*. Umited States v. Zimmer, 299 F.3d 710 (8th Cir. 2002)(affirming "manager" role where defendant directed and instructed others in cooking methamphetamine) and United States v. Lor-Solano, 330 F.3d  1288 (10th Cir. 2003)(affirming manager/supervisor increase where defendant's home was the center of the drug activity) with United States v. Burgos, 324 F.3d 88 (2d Cir. 2003)(reversing for lack of evidence that defendant directed or exercised control over others in the check cashing scheme); United

States v. Ermichine, 99 Cr. 419(SDNY) 2002 U.S. Dist. LEXIS 8038 (viewed in their totality fact that defendant recruited co-defendant, that he may have had the idea of committing a robbery of some sort, that he was going to identify a victim, and might fence the proceeds of a robbery do not indicate that he was an organizer, leader, manager, or supervisor of the conspiracy) and United States v. Guichardo, 94 Cr. 1055(SDNY)1999 U.S. Dist. LEXIS 5050(although defendant initially negotiated sale and gave codefendant money for assisting in sales evidence did not establish exercise by him of any significant independent decision making authority or control over others). *See*, *also*, United States v. Stevens, 985 F.2d 1175 (2d Cir. 1993)(court could not simply state that it had "no doubt" that the defendant controlled the operation without giving explanation as to the evidentiary basis for its view) and United States v. Gotti, 459 F.3d 296  (2d Cir. 2006)(no adjustment in the absence of evidence that defendant exhibited typical leadership characteristics.)

    Before increasing a defendant's guideline range pursuant to U.S.S.G. §3B1.1 "[a] judge should be rather confident that such an enhancement is warranted." United States v. Cotto, 979 F.2d 921, 923 (2d Cir. 1992).  That a defendant played an important or even an essential role in a criminal enterprise does not necessarily require an aggravating role adjustment of any sort. *See*, *i.e.*, United States v. Sostre, 967 F.2d 728 (1st Cir. 1992)(rejecting manager or supervisor role adjustment for drug "steerer" who played an "essential" role  in drug transactions); United States v. Litchfield, 959 F.2d 151 (10th Cir.1992)(noting that the enhancement is for "organizers or leader" not for "important or essential figures"); United States v  Parmelee, 42 F.3d 387 (7th Cir. 1994)(reversing for lack of evidence that pilot controlled or coordinated any of his co-defendants).  The decision to increase a defendant's offense level is not one to be made lightly. Nor can it be determined in a vacuum, or on a whim.  To the contrary, as noted above, it is well-

settled that such adjustments require clear and reliable evidence that an accused played an aggravating role in a given crime, as that responsibility is defined. United States v. Stevens, *supra*. In this regard, the evidence before the Court does not establish a basis for an upward adjustment for the Defendant's role in the offense. *See*, United States v. Moya, 276 Fed. Appx. 30 2008 U.S. App. LEXIS 9316 (2d Cir. N.Y. 2008); United States v. Carter, 489 F.3d 528 (2d Cir. 2007).

As noted, in this case a dozen individuals were charged under a fourteen-count indictment [3] with possession with intent to distribute marihuana. In graphic detail set out over the course of more than forty paragraphs the PSIR describes the conduct attributed to each defendant and their connection to one another. Among other things, the PSIR is rich in detail about multiple sources and sales of marihuana, cocaine, steroids, percocet, vicodin and ecstasy among and between the codefendants.[4] Remarkably, although the PSIR provides a wealth of detailed information based upon various investigative leads and tools including extensive wiretaps, physical surveillance, monitored deliveries, and post-arrest admissions by various defendants, it is notable that in only two paragraphs is there any mention of the Defendant and the role it is suggested he played in the offense. Thus, in relevant part, it is claimed at ¶¶ 10-11 of the PSR that between November 15th and November 16th of 2010 "arrangements" were made between Mr. Castillo and co-defendant Curatola to meet Castillo's alleged "money courier," co-defendant Elizabeth Jennings. Later that day, Castillo was seen entering and exiting Jennings residence several times. Elsewhere in the forty paragraphs of the PSIR the record is wholly

---

[3] Mr. Castillo was only charged under the first count of the indictment.
[4] Although the conspiracy by and large involved possession and sale of marihuana, there is evidence that during the course of it other drugs were apparently purchased and sold by several of the codefendants. *See*, *e.g*., ¶18 (codefendant Curatola involved in selling ounces of cocaine, steroids, Percocet, vicodin and ecstasy); ¶21 (codefendant Decresenzo worked closely with Curatola to distribute marihuana and some controlled substance); ¶31( "Iasparra a retail dealer of cocaine).

silent as to Mr. Castillo, or his connection, if any, to the remaining co-defendants.  In this regard, there is no evidence which indicates that he had anything to do with the co-defendants, at any time, save for Ms. Jennings on one occasion.  Indeed, the PSIR does not assert that Castillo met with or talked to the co-defendants, in person, by phone or text, at any time before November 15, 2010.  Nor does it propose that he supplied marihuana or cocaine or any other drugs to the co-defendants, or that he had purchased illicit substances from them.  Likewise, there is no allegation that he received drug proceeds from the co-defendants, or that he had provided payments to them for any illicit activity.  Despite the paucity of evidence that Mr. Castillo played an on-going role in the long-term conspiracy, let alone as a supervisor–manager within it, the PSIR erroneously suggests a three-point enhancement for that role on little more than rank conjecture.  For example, while the PSIR claims that Castillo "supervised money couriers for 'David's'[5] marihuana distribution network" there is no evidence within it that he knew, or had anything to do with an individual known by that name.  Indeed, the statement proves too much as a matter of law, given the lack of evidence connecting Castillo to any antecedent misconduct in this seven and a half month conspiracy, be it with "David," or any on else, before its final day on November 16, 2010.  So, too the assertion that Castillo supervised "couriers"[6] finds no basis in fact, and is but idle, unsupported speculation.  In this regard, although Mr. Castillo concedes that he asked co-defendant Jennings on the final day of the offense to pick up some money from a person unknown to him as a favor to a third party[7] this was a request to an acquaintance and not

---

[5] Apparently at some point in the conspiracy David became one of many sources used by the co-defendants to obtain marihuana.  *See* ¶ 8.

[6] The use of the plural *couriers*  is remarkable indeed, given the absence of any evidence in the PSIR connecting the Defendant to any antecedent criminal conduct before his arrest on November 16, 2010 and the fact that even on the date of his arrest his connection to the conspiracy was still yet limited to his involvement on one occasion with one person, co-defendant Jennings.

[7] Mr. Castillo acknowledges that he was aware that the money was the proceeds of a marihuana deal between the stranger and the person for whom he had agreed to do a favor.

an order to a subordinate who he otherwise supervised or managed.[8]   Indeed, that Mr. Castillo

asked a co-defendant to pick up the proceeds of a marihuana sale on one occasions is of no

particular moment in determining whether he exercised decision-making authority over it.  Given

these circumstances, the totality of circumstances falls far short of the proof necessary to

establish that he controlled or directed the activities of his co-conspirators at any time in any

way.  *See*, United States v. Reese  2009  U.S. App. LEXIS 10543 (2d Cir. 2009).

Here, there is no evidence that the Defendant controlled or directed the activity of others

during the course of the conspiracy as those terms are commonly understood and applied under

the Guidelines.   (*Cf*. United States v. Munoz 268 Fed Appx. 46, 2008 U.S. App. LEXIS 4669

(2d Cir. 2008)(clear evidence that the defendant exercised control over co-defendant who acted

as his driver and who one witness said worked for him);  United States v. Cotto, 979 F.2d 921(2d

Cir. 1192)(manager/supervisor role upheld where defendant decided which runners to send to

make particular deliveries and determined specific details of their assignments, where she was a

signatory of the lease for the premises used as the drug ring's office and that the cellular

telephones used by members of the ring were in the name of the alias that she used).   Nor is

there any evidence that he exercised decision-making authority over the manner and means by

---

[8] Curiously, elsewhere in the PSIR similar, or more damning conduct, between other co-defendants than that attributed to Castillo did not trigger for them a suggestion by the PSIR that a three-point adjustment for a supervisor-manager role was called for, pursuant to U.S.S.G. §3B1.1.  For example in ¶22 although the PSR notes that co-defendant Martin was selling marihuana to Curatola and sent a courier (co-defendant Iasparra) to make the deliveries, no supervisor adjustment recommended for Martin.   Indeed, according to the PSIR Iasparra was the courier for many of Martin's sales to Curotola. *See* ¶28.  (Accord ¶ 30)( Martin directed Iasparra to return to Holbrook to pick up that shipment form Curatola).   Likewise, no adjustment was recommended for Curatola although he had Decresenzo attend both transactions as an "enforcer" and then later had him accompany him to a different drug meeting to serve "as insurance to guard against a potential problem." *Id*. at ¶23.  Remarkably, although the case at bar involved a fourteen defendant conspiracy with more than a few of the co-conspirators described not just as supervisor-managers, but as leader-organizers, Mr. Castillo was the sole defendant for whom the PSIR recommended an upward role adjustment of any level.  Likewise, despite the fact that each of the defendants essentially pleaded guilty to aiding and abetting the distribution of marihuana, Castillo is the only one which the report describes accordingly. Given the use of selective role descriptions as well as its failure to apply equal standards in considering whether and to what extent role adjustment may be in order, the PSIR cannot be viewed as an objective, reliable and reasonable vehicle for the distillation of the offense conduct.

which the conspiracy operated. (*Cf.*, United States v. Hertular, 562 F.3d 433(2d Cir.2009)(defendant's decision-making authority properly found where he exercised some degree of control over others involved in the offense or played a significant role in the decision to recruit or to supervise lower-level participants); *accord*, United States v. Collazo, 2008 U.S. App. LEXIS 64 (2d Cir. 2008); United States v. Feliz-Ramirez, 223 Fed. Appx. 33, 2007 U.S. App. LEXIS 8860 (2d Cir. 2007).   Finally, from a policy standpoint, given the nature of the Defendant's participation and the absence of any evidence that he shared in the "fruits" of the crime, it cannot be said that he poses a greater danger to the public than the other conspirators, or that he is more likely to recidivate.[9]   *See*, Application Notes to U.S.S.G. §3B1.1 (a)-(c).   Under these circumstances, there is no reliable or sufficient evidence that Mr. Castillo was a leader, organizer, manager or supervisor of the offense.   Under these circumstances no increase in the Defendant's offense level is either necessary or justified.

### V.   In fashioning a Reasonable Sentence for Mr. Castillo the Court Should Not Consider as an Aggravating Circumstance the Allegations that He Was in the United States Illegally at the Time of the Crime or that He Had Laundered Proceeds of Marihuana Distribution.

In ¶106 of the PSIR it is suggested that in fashioning an appropriate sentence for Mr. Castillo Your Honor may consider as aggravating circumstances several uncharged and unproved allegations: 1) that he had been arrested for being in the United States illegally; and 2) that he had laundered proceeds of marihuana distribution.[10] Because these assertions are groundless, the Court cannot consider them in fashioning a reasonable sentence.   While the PSIR

---

[9] Insofar as the Application Notes conclude that a sentence increase for a leader-organizer or supervisor-manager is in order given the nexus between such offense conduct and recidivism upon release, in this case the concern is misplaced as Mr. Castillo will be deported to his native Canada at some point after concluding his sentence with no chance of return to the community before his deportation.

[10] It is curious, indeed disturbing, that while the PSIR concedes that these mere allegations "could not be considered" at all in calculating the suggested guideline range (*See* ¶ 106) it nonetheless tries to weave them into the sentence calculus notwithstanding the unmistakable guideline prohibition.

does not set forth with any degree of particularity the basis for these "aggravating circumstances," it is fair to assume that they derive not from independent investigation but rather extrapolation of misinformation contained in various police reports.

**1.  As to the ICE "Arrest."**

A plain read of the PSIR would lead to the conclusion that the Defendant's purported "arrest" for being in the United States illegally was unconnected to his subsequent arrest not long thereafter for conspiracy to possess and distribute marihuana.   In short, this suggestion is incorrect.   On November 15, 2010 federal agents observed co-defendant Elizabeth Jennings leave an apartment belonging to a co-defendant who was under surveillance.  Not long thereafter, agents seized Ms. Jennings and recovered a large amount of currency on her person.  Almost contemporaneously, agents entered her apartment located on Manhattan's Lower East Side.   At about the same time they stopped and searched Mr. Castillo outside a building in Brooklyn, whom they had observed go in and out of the Jennings apartment shortly before it was raided. Although at that time there was no evidence connecting Castillo to the activities of Ms. Jennings, he was nevertheless taken into custody for questioning.  During the time that he was detained agents discovered that he was a Canadian national.  Although unable at that time to arrest the Defendant for connection with Ms. Jennings, a search of US Custom's records apparently failed to reflect a recorded recent entry by Mr. Castillo into the United States.   Under these circumstances, and in order to confine Mr. Castillo while the marihuana investigation proceeded, he was detained administratively by ICE agents, for suspicion of illegal entry into the United States.

In considering whether and to what extent to factor into the Defendant's sentence calculus the allegations contained in ¶ 106 of the PSR regarding his status as a foreign national, it

is important to note that Mr. Castillo was not arrested by ICE on November 16, 2010. Moreover, the Defendant vigorously takes issue with the accusation that at the time that he was stopped by DEA agents, he was in the United States illegally.

The claim that Mr. Castillo was arrested for immigration violations finds it genesis in a lack of understanding of and familiarity with the Immigration process itself. Although individuals may be "arrested" and prosecuted in federal court for illegal entry into the United States, typically a criminal prosecution does not lie in the absence of a prior felony conviction and removal order, or a prior predicate deportation proceeding resulting from an order of an Immigration court. Neither of those circumstances is presented by the facts of this case. [11]

Every day hundreds, perhaps thousands, of foreign nationals are detained by law enforcement agents throughout the United States on suspicion that they are not lawfully in the country. In some of these instances, those detained are released when agents realize that they have been victimized by ministerial mistakes. Others are released upon satisfactory proof that their presence in the U.S. is permitted. Still yet a third category of visitors, largely Canadian and Mexican nationals, agree to voluntary departure[12] and are simply driven to an outbound port of entry and released to return to their homeland without further action by Homeland Security. In the case at bar, and many others, foreign nationals are taken into administrative custody by ICE when agents make a preliminary call that the person is not just here "illegally," but also under circumstances which raise additional concerns. Such circumstances can range from the obvious where a foreign national is caught crossing the border by evading a port of entry, to the suspicious where, as here, a foreign national may be simply be caught in the proverbial wrong

---

[11] As noted in the PSIR, Mr. Castillo has no prior criminal record and he has not before been ordered deported following a removal proceeding in an Immigration court.
[12] Voluntary departures and direct removals from the United States without formal immigration proceedings have been viewed with less favor as, increasingly, immigration policy has opted for formal designation and removal.

place at the wrong time.  In short, the decision whether to permit a foreign national to voluntarily depart, or to be released into the community with no further action or to detain them for further formal administrative action is one of discretion.  In this case ICE elected to administratively detain Mr. Castillo because a search of its data bank apparently failed to show a recent "permitted" entry for him and in the light of the suspicious circumstances surrounding his encounter with DEA agent at the Jennings home.

Having been <u>administratively</u> detained by ICE, Mr. Castillo was not under arrest and did not face criminal prosecution.  To the contrary, the administrative process is designed to permit him a number of options to remain in the United States or to leave which are triggered upon an initial appearance before an administrative judge.  Thus, Mr. Castillo could have agreed to a voluntary departure and removal order which would have been accomplished in coordination with the Canadian government.   Or, he could have denied illegal entry and required the Office of the Immigration Counsel to prove at a formal hearing that he was not lawfully in the United States and to seek a removal order.  Under such circumstances, Mr. Castillo would be entitled to due process and to seek bail in order to remain in the United States during the pendency of the proceedings. In this case, none of these procedures occurred inasmuch as the Defendant was arrested by the DEA and charged with the criminal offense at bar not long after being detained by ICE.[13]

## 2.  Mr. Castillo was lawfully in the United States at the Time of his Arrest.

Although the PSIR asserts that Mr. Castillo was illegally in the United States at the time of his arrest for conspiracy to possess and distribute marihuana, the Defendant challenges this assertion as untrue.  In point of fact, this allegation remains little more than an unproven passing

---

[13] Parenthetically it should be noted that once arrested by the DEA the immigration proceedings against Mr. Castillo were terminated with no finding one way or another about his immigration status.

reference in a police report.  Indeed, to date, no court has reached that conclusion—be it at an administrative proceeding in Immigration Court or following formal prosecution and conviction in federal court.  Under these circumstances the Court should reject the allegation and refuse to consider any such accusation as an aggravating circumstance for the purpose of Defendant's sentence.

It is well-settled that the requisite entry procedures for a Canadian national traveling to the United States by car or train is very different than for those who enter this country by airplane.[14]  Thus, when a Canadian national lands in the United States on a flight from Canada or another foreign country he or she is required to fill out an admission questionnaire and show a Canadian passport which is stamped.  Typically, entry for such visitors is entered into an ICE database which records the identity and date of entry for each such visitor.  On the other hand, those Canadian nationals who enter the United States through a land-based Port of Entry—i.e, a border crossing by car or train—are not required to fill out an admission form[15] and may be admitted without displaying a Canadian passport or other recognized identification document.[16]  Nevertheless under current protocols, it is not at all unusual for Canadians who enter the U.S. by such routes to simply present the requisite travel document and to be granted admission to this country without their passports or other identification being stamped and without their entry

---

[14] The source of information and belief in this section is evidence uncovered during the course of representing various Canadian nationals involved in cross border incidents and discussions with various immigration attorneys.

[15] Although such visitors are on occasion selected for secondary screening and required to fill out a currency reporting form, this process, unlike arrival at an airport, is entirely random.

[16] For many years the entry protocol for Canadian and U.S, nationals to visit each other's country by car or train was lax, with visitors often waived through with little more than a few questions or a quick glance by customs officials at a driver's license or other government issued identification card.  On June 1 2009, that process was changed to require presentation at a port of entry of a passport; in practical terms, there has been a grace period during which alternate, government-issued  ID cards have been acceptable, including tribal band cards issued by the Interior Department, or driver licenses from neighboring provinces, as well as US-issued frequent border crossing ID cards.

otherwise being recorded in an ICE data base.[17]  This is especially true for those Canadians who enter the U.S. by train or who cross a port of entry by car either during peak travel hours or who traverse the U.S. border in a vehicle with multiple passengers.  In addition, Canadian nationals do not need a visa to visit the United Sates, are not limited in the number and frequencies of theirs visits and are permitted to remain in this country for up to six months.  Given the discretion vested in the hands of Customs officials as well as the variables which routinely impact upon information maintained by Homeland Security it is of no particular moment that at the time of the Defendant's seizure his name did not appear in an ICE data bank.  In short, this omission did not necessarily establish that Mr. Castillo's presence in the United State was illegal.[18]  For this reason and in the absence of a judicial or administrative court finding that the Defendant was in the United States illegally at the time of the offense conduct, Your Honor should not consider this allegation as a potential aggravating circumstance.

### 3. There is No Proof that Mr. Castillo Engaged in Money Laundering.

Given the absence of any evidence before the Court of money laundering in the prosecution at bar[19]/[20] it is fair to presume that to the extent that the PSIR concludes that the "[i]nstant investigation revealed that [Mr. Castillo] laundered the proceeds of marihuana

---

[17] Of course it is well-settled that human error often affects the reliability of information generated and maintained by Homeland Security and its various agencies including ICE and U.S. Customs.  *See* "Head of Arab-American center in Dearborn arrested by mistake," *USA Today*, 11/13/2012; "Meet Mikey, 8: U.S. has Him on Watch List," *New York Times*, 13 Jan. 2010; "Immigration Crackdown Also Snares Americans," *New York Times,*13 Dec. 2011: "American citizens have been confined in local jails after federal agents, acting on flawed information from Department of Homeland Security databases, instructed the police to hold them for investigation…."  In this regard there have been occasions when custom's officials failed to enter or improperly entered computer data pertaining to the identity of visitors and the date of their entry.

[18] There is of course no statutory presumption, let alone an un-rebuttable one, that if a Canadian national's name and date of entry does not appear in an ICE data bank, his or her presence in the United States was necessarily occasioned by an illegal entry.

[19] In the fourteen-count indictment before Your Honor there is no allegation that money laundering played a role in the conspiracy.  Nor is there a forfeiture count which seeks assets from any of the accused on the grounds that they were acquired in any such offense.  Nor does the phrase money laundering appear in any of the forty paragraphs which describe in graphic detail the offense conduct.

[20] Mr. Castillo specifically challenges the PSIR's assertion that he has been involved in money laundering, be it in this case or at any other time.

distribution" (*See* ¶ 106) this allegation must find its genesis in a dated DEA report obtained from its Asset Forfeiture Unit.  A synopsis of the report appears in the PSIR and details an encounter between the DEA and Mr. Castillo in East Elmhurst New York on October 18, 2007.[21]/[22]  In relevant part, at that time the DEA searched Defendant's automobile and seized $55,980.00 in U.S. currency from him as drug proceeds.  *Id.*   It is important to note that although the currency was seized as drug proceeds, Mr. Castillo was not arrested, [23] processed or detained by the DEA.

It is respectfully submitted that a review of the events surrounding the seizure of the currency as well as the outcome of the Defendant's demand for the return of it is most instructive in so far as the PSIR suggests that Your Honor should consider the events as an aggravating factor for purposes of sentence.

On October 19, 2007 Mr. Castillo was forcibly stopped by DEA agents in East Elmhurst, New York.  At the time he was lawfully in the United States on a business trip to return custom wheel rims for a refund of money to his business, which was registered under the laws of Quebec and located in that province.[24]  While the basis for the stop of the Defendant is unknown, almost

---

[21] Although the PSIR implies a connection between the current investigation and the seizure of money from the defendant in 2007 as laundered proceeds of marihuana distribution, it must be noted that the seizure predates the onset of the conspiracy at bar by almost three years and defendants established role within the conspiracy by almost four years.

[22] Mr. Castillo challenges various aspects of the information apparently reduced to writing by field agents and later memorialized in the Asset Forfeiture report.  For example, he specifically denies that he was unable to provide to agents the name or phone number of the business that he had visited on this trip.  So, too, although Mr. Castillo would have granted agents permission to search his car if requested, that is not what occurred here.  In point of fact, agents approached the Defendant, ordered him to exit his vehicle and undertook a full blown consent-less search of it.

[23] Although the PSIR cynically suggests that the Defendant got away with something at the time that he was stopped by the DEA in 2007 and, accordingly, describes the encounter as a potential aggravating circumstance, no adverse inference should be drawn from the decision to "decline" prosecution of him on the grounds of "insufficient evidence." *See* ¶ 106. Indeed there is no support in the Guidelines or the law for the suggestion in the PSR that Mr. Castillo may be further punished now for dated antecedent events in which decisions were made by law enforcement, including a federal prosecutor, not to charge him for any criminal wrongdoing arising from the encounter or to forfeit the money seized during it.

[24] See annexed hereto as Exhibit A, affidavit by Michel Larouche, counsel for Defendant's business and a copy of the Quebec Business Registrar.

immediately his vehicle was searched and $55,980.00 in U.S. currency was recovered from inside it.  The money constituted proceeds from a refunded purchase order from a Long Island-based custom rim supplier, after a Canadian customer reneged on an agreement to buy a quantity of very expensive wheels from the Defendant's company, which his company had purchased with funds "up front" from the American supplier.  Although Mr. Castillo was briefly detained and questioned, not long thereafter he was released with no criminal charges lodged.[25]  Approximately three months later Mr. Castillo received a notice of forfeiture in which he was advised that the DEA intended to forfeit the currency "because the property was used or acquired as a result of a violation of the Controlled Substance Act.[26]  Over the next several months the Defendant's Canadian Attorney sought the return of the currency on behalf of him and his business on hardship grounds[27]—Prestige Wheels would almost certainly have suffered a mortal blow had the funds been written off as a loss. Ultimately, that request was denied and formal forfeiture proceedings were referred to the U.S. Attorney's Office in the Eastern District of New York.[28] Following an investigation by the U.S. Attorney's Office, the Defendant learned on the 22nd of December, 2008 that prosecutors had elected not to file an action to forfeit the currency as drug proceeds and had instructed the DEA to facilitate the return of the currency to Mr. Castillo through the United States Marshal's Service upon receipt of a hold harmless agreement.[29]  On the 13th of January Mr. Castillo executed the hold harmless agreement and on

---

[25] To the extent that the PSIR in its Criminal History Section states that the defendant's chance encounter with the DEA in 2007 led to his formal arrest for Money Laundering, and further suggests that the prosecution was ultimately dismissed for insufficient evidence, (*See* ¶ 60) it is wrong. In point of fact no charge was filed against Mr. Castillo at that time or any other for money laundering.

[26] See annexed hereto as Exhibit B, DEA forfeiture notices dated January 16th and February 28th of 2008.

[27] See Exhibit A, *supra*.

[28] See annexed hereto as Exhibit C, Department of Justice denial dated May 29, 2008 and notice of referral to the US Attorney's Office for the Eastern District of New York, dated May 30, 2008.

[29] See annexed hereto as Exhibit D, DEA letters to Mr. Castillo, dated and U.S. Marshal's Service, dated.

February 26th of 2009 the Marshal's Service refunded in full the currency to Mr. Castillo which the DEA had seized from him as drug proceeds some sixteen months before.[30]

Because Mr. Castillo was not arrested, let alone prosecuted, for that offense and inasmuch as the currency which was seized from him was subsequently returned following a sixteen month investigation, Your Honor should dismiss the entire affair as little more than law enforcement hyperbole.  Likewise, to the extent that the PSIR suggests that the Court should consider the seizure as an aggravating sentence factor Your Honor should reject it out of hand as groundless.[31]

**VI. Pursuant to 18 U.S.C. §3553(a) the Sentence to Be Imposed Must Be the "Minimum Necessary" One.**

In a series of recent decisions, the Supreme Court and the Second Circuit have noted that under the advisory Guidelines regime, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008). *See also generally* Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007); Rita v. United States, 551 U.S. 338 (2007). Nevertheless, the sentencing judge must comply with certain procedural requirements. First, the court must calculate the applicable Sentencing Guidelines range after making such factual findings as are necessary. United States v. Crosby, 397 F.3d 103, 111-12 (2d Cir. 2005); Cavera, 550 F.3d at 189.  It must then consider the Guidelines range, together with applicable

---

[30] See annexed hereto as Exhibit E, executed hold harmless agreement and copy of refund check.

[31] To the extent that the PSR relies upon the seizure of defendant's currency as the basis for its assertion that Mr. Castillo was involved in laundering the proceeds of marihuana distribution, the return of the currency should completely defuse any such claim. Indeed, the Court can take judicial notice that rare is the case in which a large amount of currency seized by the DEA as the proceeds of a drug crime is later ordered returned by federal prosecutors after a sixteen month investigation, particularly given the fact that the burden of proof to sustain the seizure is not beyond a reasonable doubt, but merely a preponderance of the evidence. *See*, *generally*, United States v. Parcel of Property, 337 F.3d 225 (2d Cir. 2003); United States v. U.S. Currency in the Sum of One Hundred and Eighty-Five Thousand Dollars, 455 F. Supp 2d 145, 153 (E.D.N.Y. 2006).

policy statements issued by the Sentencing Commission, as required by § 3553 (a) (5); Crosby, 397 F.3d at 112.   The court may not presume that the suggested Guidelines sentence is reasonable, but "must instead conduct its own independent review of the sentencing factors, aided by that arguments of the prosecution and the defense." Cavera, 550 F.3d at 189.   In addition, "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." Id.at 191.   Finally, after accounting for the Guidelines range, the court must consider the relevant factors listed in § 3553 (a) (5) for the proper exercise of its discretion in the imposition of a reasonable sentence on a case by case basis. (See United States v. Crosby, 397 F.3d 103, 111-112)("Prior to Booker the §3553(a) requirement that the sentencing judge consider all of the factors enumerated in that section had uncertain import.   Now, with the mandatory duty to apply the Guidelines excised, the duty imposed by §3553(a) to "consider" numerous factors acquires renewed significance).[32]

The parsimony clause of 18 U.S.C. §3553(a) mandates that the court impose the minimum sentence necessary in light of the factors which it enumerates. In relevant part §3553(a) states that the *court shall impose a sentence sufficient, but not greater than necessary,* to comply with the purposes set forth in paragraph (2) of this subsection.   In determining the particular sentence to be imposed, the court shall consider, among other things, (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (i) to reflect the seriousness of the offense, to promote respect for the law,

---

[32] See, also, United States v. Maflahi, 2005 U.S.App. Lexis 10496 (2nd Cir. 2005)(the district court erred when it treated the Guidelines as advisory, but did not consider the factors enumerated in 18 U.S.C. §3553(a), which included the Defendant's lack of criminal history, his family's circumstances, and his employment history); United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005)("Consistent with the remedial scheme set forth in Booker, a district court shall first calculate [after making the appropriate findings of fact] the range prescribed by the guidelines.   Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in §3553(a) before imposing the sentence").

and to provide just punishment for the offense; (ii) to afford adequate deterrence to criminal conduct; (iii) to protect the public from further crimes of the defendant; and (iv) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;  (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for (i) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) any pertinent policy statement issued by the Sentencing Commission pursuant to § 994(a)(2) of title 28, United States Code; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

       Your Honor is well-aware that Mr. Castillo is a Canadian citizen.  Unable to post bail, he has remained incarcerated since his detention by ICE agents on November 16, 2010.[33] Through most of the 15-plus months that the Defendant has been incarcerated he has been held at the GEO Queens Facility, a private warehouse-style jail located near John F. Kennedy Airport, in Queens, N.Y.  Essentially a vast, corrugated steel-truss box under private contract for housing detainees, the facility offers none of the services or programs available in Bureau of Prisons facilities to eligible inmates: there are no recreational programs, no real library, and no education or inmate improvement programs; the only exercise area consists of a walled-in area scarcely bigger than a suburban driveway.  Indeed, under these circumstances the conditions of the Defendant's pre-trial confinement have been more severe than those faced by co-defendants in the same case who have been housed in BOP or County facilities.

---

[33] In point of fact although the defendant has been in custody since November 16, 2010 more than a week of that time was spent detained pursuant to an administrative immigration hold, for which Mr. Castillo will get no jail credit in computing his sentence.

Throughout this time the Defendant has been isolated in more ways than "just" the conditions of his confinement.  For example, throughout this time he has remained separated from his family and friends who reside in Canada, unable to travel to the United States to see him.  No matter what sentence Your Honor imposes upon Mr. Castillo, he will not be discharged upon its completion but rather returned to the custody of Homeland Security for eventual repatriation to Canada.[34]  At one time, this process was accomplished with relative speed, taking little more than the time it took to appear in front of an administrative law judge, to agree to deportation, and to be removed from the U.S. by a six- or seven-hour drive north to the Canadian border. That no longer holds true. Now the removal process can typically take one to two months, and on occasion can run even longer.[35]  In this light, Mr. Castillo's incarceration in the United States will be extended beyond the sentence contemplated by the Court and penalize him for his conviction in a way not encountered by his American codefendants.

Mr. Castillo stands before Your Honor with an offense level of 17 and a criminal history category of I which produces a suggested guideline range of 24 to 30 months. The PSR suggests a sentence of 24 month sentence for the Defendant who is personally accountable for 20-40 kilos of marihuana.[36] If Your Honor accepts the Defendant's argument that the government has not

---

[34] As a convicted felon with a conviction for marihuana trafficking there are no grounds upon which Mr. Castillo could seek or be granted release or bail pending his deportation to Canada.

[35] Several years ago a Canadian citizen traveling through the United States was mistakenly deported to Syria, his birthplace, and held for more than a year before he was returned to Canada. During that time he was repeatedly tortured as a result of his family's opposition to the regime. Because of this case, a new cumbersome protocol was instituted between the United States and Canada which requires a drawn out investigation by each country to ensure that foreign nationals are in fact returned to their current country of citizenship. Among other steps before Castillo is repatriated to Canada, Homeland Security will have to reach out to its counterpart in British Columbia for a background check of Castillo's bona fides. If approved, officials in British Columbia must notify others in the Canadian government in Ottawa, and ultimately, Quebec, to finalize Castillo's repatriation. Once finalized and approved Homeland Security is in turn notified and then initiates removal proceedings which create additional delay in the United States. Although counsel has had one case in which a Canadian national has been removed to Canada in several weeks, based upon experience and discussions with other members of the bar it has proven to be the exception and not the rule.

[36] This amount places Mr. Castillo at the low end of the accountability calculus essentially comparable to that attributed to six of his codefendants and less culpable than seven others personally accountable for kilos of

met its burden of proof under the totality of circumstances that he was a supervisor-manager of the charge to which he pleaded guilty then his offense level necessarily drops three levels to 14 producing a suggested sentence range of 15-21 months.

Under these circumstances it is respectfully submitted that given the conditions attendant to Mr. Castillo's confinement and the fact that he will not be released upon completion of his sentence, it is respectfully submitted that a sentence of time served or seventeen months would be reasonable.  A seventeen-month sentence would not only place Mr. Castillo roughly in the middle of the suggested sentence range should the Court reduce his offense level by three, but would reflect the approximate period of time that he has to date been incarcerated.  In the event that Your Honor finds that the suggested three-level role enhancement is appropriate, nevertheless for the reasons to follow, a non-guideline sentence of seventeen months would still be nonetheless reasonable.

While the offense before the Court is not insignificant, in  considering the appropriate sentence for Mr. Castillo pursuant to 18 U.S.C. §3553 Your Honor should begin from the basic fact that the Defendant does not have a prior criminal record either in the United States or Canada, is not a predator or charged with a crime of violence. Likewise, the Defendant's conviction does not stem from the sale of hard drugs, or distribution of large amounts of marihuana. So, too, other than his limited activity over the period of November 15-16 of 2010 there is no evidence that Mr. Castillo was otherwise involved during the life span of this approximate seven month conspiracy.  Nor can the offense at bar be described as a sophisticated wide ranging criminal venture.[37]

---

marijuana that range from 60-80 at the "low end" to three who fall within the range of 100 – 400 kilograms at the high end.
[37] Indeed, a plain read of the 40 plus paragraph description of the offense conduct shows that typically the offense a spin off of a bookmaking operation (*see*, ¶ 2) was a "mom and pop" operation with a variety of small time suppliers

As noted in detail elsewhere in the instant submission, Jose Castillo-Medina grew up in difficult circumstances, in an impoverished Honduran family, terrorized by an alcoholic abusive father; he ran away from home often, and was beaten repeatedly, while also witnessing beatings administered to his mother and siblings.  His family ultimately emigrated as refugees to Canada, after his father cooperated against criminal elements within the Honduran armed forces; once in Canada, his father was arrested, stripped of his refugee status and deported for abusing his daughter, leaving the Defendant an emancipated seventeen-year old in a foreign country, with little in the way of support.  The Defendant struggled to learn his adopted country's language, and to get an education, while working his way up from kitchen scullery jobs to become a headwaiter in an upscale restaurant; demonstrating the diligence and focus of striving immigrants in North America, he founded first one business, then a second, in the auto-customizing and detailing industries.  Throughout his adulthood, he has struggled with a serious addiction to alcohol and the abuse of marijuana, culminating in the collapse of his marriage to a Canadian woman; that addiction remains untreated.  He has in general conducted himself as a hard-working citizen of his adopted country, and  his criminal conduct in the events at bar must be viewed against the entirety of his otherwise lawful and productive life.

---

and a series of relatively small marihuana deals among and between them. *See*, *generally*, PSR ¶ 24 (5 lb. sale on June 21st; 5 lb. sale on June 27th, 5 lbs. on July 8th, 5 lbs. on July 21st, 7.5 lbs. on August 11th); ¶ 30 (5 lbs. on April 28th, 2 to 3 lbs. on May 5th, 3 lbs. on May 27th); ¶ 28 (5 lbs. April 28th, 2-3 lbs. May 15th, 3 lbs. May 27th,5 lbs. June 21st, 5 lbs June 27th, 5lbs. July 8th, 5 lbs. July 21st, 7.5 lbs. August 11th); ¶ 35 (4-5 lbs. May 31st, 3lbs. June 7th, 3-4 lbs. November 8th); ¶ 38 (10 lbs. June 18th); ¶ 41(15 lbs. August 10th, 8 lbs. November 4th, 3lbs. November 8th --with a pound and a half returned).Often the offense conduct was augmented by audacious plans that never came to pass. *See*, *generally*, PSR ¶ 18, ¶ 36. Moreover in examining the accountability levels it is significant that of the 14 defendants arrested in this conspiracy 11 including Mr. Castillo were personally accountable for relatively small amounts of marihuana with two responsible for 5-10 kilos, three for 10 to 20 kilos, two for 20 to 40 kilos (including Mr. Castillo), and four for 60-80 kilos.

**VII.  Conclusion.**

For all the reasons hereinabove set forth, a sentence of seventeen months would be both a reasonable and appropriate balance of the concerns and considerations of the sentencing guidelines and 18 U.S.C. §3553, and the specific facts and circumstances of the case at bar.

Respectfully Submitted,

_____

Stanley L. Cohen, Esq.
Bar Roll 601215
Counsel for Jose A. Castillo-Medina
119 Avenue D, Fifth Floor
New York City, NY  10009
Tel: 212-979-7572/fax. 212-995-5574
stanleycohenlaw@verizon.net

# EXHIBITS

C A N A D A

PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

| | |
|---|---|
| Asset Id: | 08-DEA-491346 |
| Case Number: | C1-07-0278 |
| Property: | 55 980,00 $ U.S. Currency |
| Serial Number: | 08-0059 |
| Asset Value: | 55 980,00 $ U.S. Currency |
| Seizure Date: | 10/18/2007 |
| Seizure Place: | East Elmhurst, NY |
| Owner Name: | 9145-0247 Quebec inc. |
| Seized From: | Castillo-Medina Jose Alejandro |
| Judicial District: | Eastern District of New York |

## A F F I D A V I T

I, the undersigned, **MICHEL LAROUCHE**, attorney, having my law office at 240, Saint-Jacques Street, Suite 701, at Montreal, province of Quebec, Canada, H2Y 1L9, 1 (514) 987-5110, hereby make oath and state as follows :

1. I am the holder of solicitor's permit No. 199140-0, date April 1st 1997 and I have in all respects complied with the conditions prescribed in the *Act respecting the Barreau du Quebec* (R.S.Q., c. B-1) regarding such permit ;

2. I represent the interests of the company 9145-0247 Quebec inc., called « Prestige Wheel Gallerie », which sells mags and cars accessories, the whole as it appears from a research report in the database of the Quebec Enterprise Registrar ;

3. Mr. Jose Alejandro Castillo-Medina is the president of the aformentionned company the whole as it appears from the research report from the database of the Quebec Enterprise Registrar joined to the present ;

4. Mr. Jose Alejandro Castillo-Medina has to carry on the exploitation of the aformentionned company which is pursuing an organized economic activity of a commercial nature, consisting in the acquisition, administration, alienation and administering property and the service business ;

5. I contest the forfeiture of the seized property : 55 980,00 $ U.S. Currency, on October 18, 2007, relative to the case number C1-07-0278 in the judicial district of Eastern District of New York ;

6. It appears that the company 9145-0247 Quebec inc., is the owner of the amount of 55 980,00 $ U.S. Currency ;

EXHIBIT A

7.    On October 18, 2007, Mr. Jose Alejandro Castillo-Medina was in the United States of America to purchase goods for the company 9145-0247 Quebec inc. in the course of business operations for the said company;

8.    Because of the forfeiture, Mr. Jose Alejandro Castillo-Medina was enable to purchase the said goods ;

9.    Because of the forfeiture and all her consequences, the company 9145-0247 Quebec inc. is facing a financial crisis ;

10.   The company 9145-0247 Quebec inc. is actually unable to meet some of it's debt obligations ;

11.   If the company 9145-0247 Quebec inc. is incapable to straightening out fast the forfeiture, she will near be insolvent and will be obligated to file for bankruptcy under the provisions of the *Bankruptcy and Insolvency Act*, an Act that is administered by the Office of the Superintendent of Bankruptcy;

12.   For the reasons mentioned above, I request the release of the seized property during the pendency of the forfeiture proceeding due to hard ship ;

13.   I can be reached at any time at the following number: 1 (514) 987-5110 ;

14.   All the facts deposed to in this affidavit are within my personal knowledge and are true and correct.

AND I HAVE SIGNED AT MONTREAL,
THIS 1st DAY OF APRIL 2008.

MICHEL LAROUCHE, ATTORNEY

I CERTIFY THAT THE DEPONENT ACKNOWLEDGED TO ME THAT HE KNOWS
AND UNDERSTANDS THE CONTENT OF THIS DECLARATION, THAT HE HAS
NO OBJECTION TO TAKING THIS PRESCRIBED OATH AND CONSIDERS IT TO
BE BINDING ON HIS CONSCIENCE. THUS SIGNED AND SOLEMNY SWORN
TO BEFORE ME AT MONTREAL ON THIS 1st DAY OF APRIL 2008.

COMMISSIONER OF OATHS

Commissaire à l'assermentation
MYRIAM LAJEUNESSE
MATRICULE 166 179
POUR LES DISTRICTS JUDICIAIRES DE MONTRÉAL ET LAVAL

EXHIBIT A



**U.S. DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**

Jose Alejandro Castillo-Medina
c/o Michelle Larouche/Esq.
240 Saint Jacque Street West
Suite 701
Montreal, PQ H2Y1L9 Canada

| | |
|---|---|
| Asset Id: | 08-DEA-491346 |
| Case Number: | C1-07-0278 |
| Property: | $55,980.00 U.S. Currency |
| Serial Number: | 08-0059 |
| Asset Value: | $55,980.00 |
| Seizure Date: | 10/18/2007 |
| Seizure Place: | East Elmhurst, NY |
| Owner Name: | |
| Seized From: | Castillo-Medina, Jose Alejandro |
| Judicial District: | Eastern District of New York |

**NOTICE MAILING DATE:** January 16, 2008

## NOTICE OF SEIZURE

The above-described property was seized by the Drug Enforcement Administration (DEA) for forfeiture pursuant to **Title 21, United States Code (U.S.C.), Section 881**, because the property was used or acquired as a result of a violation of the Controlled Substances Act (Title 21, U.S.C., Sections 801 et seq.). The seizure date and place, as well as other pertinent information regarding the property are listed above.

Pursuant to Title 18, U.S.C., Section 983 and Title 19, U.S.C., Sections 1602-1619, procedures to administratively forfeit this property are underway. You may petition the DEA for return of the property or your interest in the property (remission or mitigation), and/or you may contest the seizure and forfeiture of the property in Federal court. **You should review the following procedures very carefully.**

## TO REQUEST REMISSION OR MITIGATION OF FORFEITURE

If you want to request the remission (**pardon**) or mitigation of the forfeiture, you must file a petition for remission or mitigation with the Forfeiture Counsel of the DEA within thirty **(30)** days of your receipt of this notice. The petition must include proof of your

interest in the property and state the facts and circumstances which you believe justify remission or mitigation. The regulations governing the petition process are set forth in Title 28, Code of Federal Regulations, Part 9.

## TO CONTEST THE FORFEITURE

In addition to, or in lieu of petitioning for remission or mitigation, you may contest the forfeiture of the seized property in UNITED STATES DISTRICT COURT. To do so, you must file a claim with the Forfeiture Counsel of the DEA by **February 20, 2008**. The claim need not be made in any particular form (Title 18, U.S.C., Section 983(a)(2)(D)). The claim shall identify the specific property being claimed; state the claimant's interest in such property; and be made under oath, subject to penalty of perjury (Title 18, U.S.C., Section 983(a)(2)(C)). A frivolous claim may subject the claimant to a civil fine in an amount equal to ten (10) percent of the value of the forfeited property, but in no event will the fine be less than $250 or greater than $5,000 (Title 18, U.S.C., Section 983(h)). Upon the filing of a claim under Title 18, U.S.C., Section 983(a), a claimant may request, pursuant to Section 983(f), release of the seized property during the pendency of

the forfeiture proceeding due to hardship. Requests must be sent to the Forfeiture Counsel of the DEA. The following property is not eligible for hardship release: contraband, currency, or other monetary instruments or electronic funds unless the property constitutes the assets of a legitimate business which has been seized; property to be used as evidence of a violation of the law; property, by reason of design or other characteristic, particularly suited for use in illegal activities; and property likely to be used to commit additional criminal acts if returned to the claimant. If you wish to contest the forfeiture of the asset, you must comply with the procedures set forth herein. Your failure to do so will result in the termination of your interest in the asset, and may preclude your contesting the forfeiture of the asset in any judicial proceeding - either civil or criminal - even if such a proceeding has already been commenced or is commenced in the future.

## WHERE TO FILE CORRESPONDENCE

All submissions must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, HQs Forfeiture Response, P.O. Box 1475, Quantico, Virginia 22134-1475. Correspondence sent via private delivery must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, VA 22152. A PETITION, CLAIM, OR OTHER CORRESPONDENCE SHALL BE DEEMED FILED WITH THE FORFEITURE COUNSEL, ASSET FORFEITURE SECTION, WHEN RECEIVED BY THE DEA AT EITHER OF THE ADDRESSES NOTED ABOVE. SUBMISSIONS BY FACSIMILE OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED. The Asset ID referenced above should be used with all submissions. Failure to include the Asset ID may cause a delay in processing your submission(s).

**EXHIBIT B**

**U.S. DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**

Jose Alejandro Castillo-Medina
c/o Michelle Larouche Esq.
240 Saint Jacques Street West, Suite 1001
Montreal, PQ H2A2X8 Canada

| | |
|---|---|
| Asset Id: | 08-DEA-491346 |
| Case Number: | C1-07-0278 |
| Property: | $55,980.00 U.S. Currency |
| Serial Number: | 08-0059 |
| Asset Value: | $55,980.00 |
| Seizure Date: | 10/18/2007 |
| Seizure Place: | East Elmhurst, NY |
| Owner Name: | |
| Seized From: | Castillo-Medina, Jose Alejandro |
| Judicial District: | Eastern District of New York |

NOTICE MAILING DATE: February 28, 2008

## NOTICE OF SEIZURE

The above-described property was seized by the Drug Enforcement Administration (DEA) for forfeiture pursuant to **Title 21, United States Code (U.S.C.), Section 881**, because the property was used or acquired as a result of a violation of the Controlled Substances Act (Title 21, U.S.C., Sections 801 et seq.). The seizure date and place, as well as other pertinent information regarding the property are listed above.

Pursuant to Title 18, U.S.C., Section 983 and Title 19, U.S.C., Sections 1602-1619, procedures to administratively forfeit this property are underway. You may petition the DEA for return of the property or your interest in the property (remission or mitigation), and/or you may contest the seizure and forfeiture of the property in Federal court. **You should review the following procedures very carefully.**

## TO REQUEST REMISSION OR MITIGATION OF FORFEITURE

If you want to request the remission **(pardon)** or mitigation of the forfeiture, you must file a petition for remission or mitigation with the Forfeiture Counsel of the DEA within thirty **(30)** days of your receipt of this notice. The petition must include proof of your

interest in the property and state the facts and circumstances which you believe justify remission or mitigation. The regulations governing the petition process are set forth in Title 28, Code of Federal Regulations, Part 9.

## TO CONTEST THE FORFEITURE

In addition to, or in lieu of petitioning for remission or mitigation, you may contest the forfeiture of the seized property in UNITED STATES DISTRICT COURT. To do so, you must file a claim with the Forfeiture Counsel of the DEA by **April 3, 2008**. The claim need not be made in any particular form (Title 18, U.S.C., Section 983(a)(2)(D)). The claim shall identify the specific property being claimed; state the claimant's interest in such property; and be made under oath, subject to penalty of perjury (Title 18, U.S.C., Section 983(a)(2)(C)). A frivolous claim may subject the claimant to a civil fine in an amount equal to ten (10) percent of the value of the forfeited property, but in no event will the fine be less than $250 or greater than $5,000 (Title 18, U.S.C., Section 983(h)). Upon the filing of a claim under Title 18, U.S.C., Section 983(a), a claimant may request, pursuant to Section 983(f), release of the seized property during the pendency of

the forfeiture proceeding due to hardship. Requests must be sent to the Forfeiture Counsel of the DEA. The following property is not eligible for hardship release: contraband, currency, or other monetary instruments or electronic funds unless the property constitutes the assets of a legitimate business which has been seized; property to be used as evidence of a violation of the law; property, by reason of design or other characteristic, particularly suited for use in illegal activities; and property likely to be used to commit additional criminal acts if returned to the claimant. If you wish to contest the forfeiture of the asset, you must comply with the procedures set forth herein. Your failure to do so will result in the termination of your interest in the asset, and may preclude your contesting the forfeiture of the asset in any judicial proceeding - either civil or criminal - even if such a proceeding has already been commenced or is commenced in the future.

## WHERE TO FILE CORRESPONDENCE

All submissions must be filed with the  Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, HQs Forfeiture Response, P.O. Box 1475, Quantico, Virginia 22134-1475. Correspondence sent via private delivery must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, VA 22152.   A PETITION, CLAIM, OR OTHER CORRESPONDENCE SHALL BE DEEMED FILED WITH THE FORFEITURE COUNSEL, ASSET FORFEITURE SECTION, WHEN RECEIVED BY THE DEA  AT EITHER OF THE ADDRESSES NOTED ABOVE. SUBMISSIONS BY FACSIMILE OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED.    The Asset ID referenced above should be used with all submissions. Failure to include the Asset ID may cause a delay in processing your submission(s).

# EXHIBIT B

U. S. Department of Justice

Drug Enforcement Administration

Washington, D.C.  20537

---

*www.dea.gov*                                April 15, 2008

**REGISTERED MAIL – RETURN RECEIPT REQUESTED**

Michel Larouche, Esq.
240, rue St.-Jacques Quest
Suite 701
Montreal, Quebec  H2Y 1L9
Canada

RE:   DEA Case No.:      C1-07-0278
      Asset I.D. No.:      08- DEA-491346
      Property:          $55,980.00 U.S. Currency
      Client:            9145-0247 Quebec Inc., Attn: Jose Alejandro Castillo-Medina, President

Dear Mr. Larouche:

The Drug Enforcement Administration (DEA), has received the correspondence for the above
referenced property.  Unfortunately, if the correspondence was intended to be a claim it was
defective for the reasons noted below and is therefore being returned:

____   The submission did not identify the specific property being claimed.
       <u>See</u> 18 U.S.C. § 983(a)(2)(C)(i).

____   The submission did not state claimant's interest in the property. <u>See</u> 18 U.S.C. § 983(a) (2)
       (C) (ii).

XX_    The party asserting an interest in the property did not sign the submission.  A claim cannot be
       signed by a third party on behalf of a claimant (e.g., an attorney representing a claimant
       cannot sign the claim for his/her client).  <u>See</u> 18 U.S.C. § 983(a) (2) (C).

XX_    The submission was not made under oath, **subject to penalty of perjury**.  <u>See</u> 18 U.S.C. §
       983(a) (2) (C) (iii).  It is not sufficiently clear that the party's statements were subject to the
       penalty of perjury.  A claim must clearly state that the claimant is making the statements,
       subject to the penalty of perjury.  A claimant may use the following language to satisfy this
       requirement:
              **I declare (or certify, verify, or state) under penalty of perjury that
              the foregoing is true and correct.        Executed on (date)**

              **(Signature of Claimant)**

                                                              EXHIBIT B

__XX__    Other:  Please be advised that your request for release of the property due to hardship cannot be given consideration at this time because your client did not submit a valid claim.

As a matter of discretion, you are allowed **twenty (20) days** from the date of your receipt of this letter to cure any deficiencies noted above and file a valid claim with the Forfeiture Counsel at one of the addresses noted below.  If the corrections are not made, the DEA may treat the documents as nugatory, and the case shall proceed as though the documents had not been tendered.  See 21 C.F.R § 1316.76.

Further correspondence/claims regarding this matter must reference the DEA and asset identification numbers noted above and must be addressed to the Forfeiture Counsel, Office of Chief Counsel, Drug Enforcement Administration, HQs Forfeiture Response, P.O. Box 1475, Quantico, VA  22134-1475.  Correspondence sent via a next day delivery type service must be sent to the Asset Forfeiture Section, Office of Chief Counsel, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, Virginia 22152.  A claim will be deemed *filed (or submitted)* on the **business date** it is actually received by the Forfeiture Counsel at one of the addresses listed above.  **Mail will not be accepted nor considered filed at either address on weekends or federal holidays.**  A claim is not considered filed or submitted when it is received by any other office or official, such as a court, United States Attorney's Office, or local DEA office.  In addition, a claim is not considered filed or submitted if received by an electronic fax transmission.  Finally, a claim is not considered filed or submitted on the date it is mailed or delivered to any person for delivery to the Forfeiture Counsel.

Sincerely,

Asset Forfeiture Section, OMA
Office of Operations Management

Enclosure

CLAIM.DEFECT.LETTER (DEC. 05)          BY: PB          AD CODE #: 970

EXHIBIT B

U. S. Department of Justice

Drug Enforcement Administration

www.dea.gov

MAY 2 9 2008

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Michel Larouche, Esq.
Larouche & Associés
240, Rue Saint-Jacques Ouest, Suite 701
Montreal, Quebec
Canada  H2Y 1L9

RE:  DEA Case No.: C1-07-0278
      DEA Asset I.D. No.: 08-DEA-491346
      Property: $55,980.00 U.S. Currency
      Client/Petitioner:  9145-0247 Quebec Inc.
               Jose Alejandro Castillo-Medina, Owner/President

Dear Mr. Larouche:

     The Drug Enforcement Administration (DEA), Asset Forfeiture Section, received your latest correspondence dated May 15, 2008, which includes your client's request for the release of the above-referenced seized currency during the pendency of the forfeiture proceeding due to hardship. Please be advised that currency or other monetary instruments are not eligible for such release unless that property constitutes the assets of a legitimate business which has also been seized. See Title 18, United States Code, Section 983(f)(8)(A).

     A review of the case file and your correspondence indicates that the referenced currency did not constitute the proceeds of a business that was also seized.  Therefore, this property is not eligible for such release prior to the disposition of the forfeiture proceeding.  You may consider this a denial of your client's request.  This decision is final and no further requests for hardship release will be considered by DEA.  Your client's claim for the referenced property will be addressed under separate cover.

                                 Sincerely,

                                 5/29/8

                             Robert Porzeinski
                             Senior Attorney
                             Asset Forfeiture Section

**EXHIBIT C**

01/13/2009 14.03 FAX                                                                    @001

**Department of Justice**
**Drug Enforcement Administration**

## FAX Transmittal Sheet for UNCLASSIFIED Information Only

| **1** | 1 / 12 / 2008 | **2** | Number of pages being transmitted 3 |
|---|---|---|---|
| | Transmission Date (MM/DD/YYYY) | | (Including this transmittal sheet) |

**3** TO:   FAX FTS #: _514 987-5958_

FAX COMMERCIAL #: _____

NAME: _Michel Laroche, Attorney at Law_

PHONE: _____

OFFICE/ORG: _____

**4** FROM: FAX FTS #: _____

FAX COMMERCIAL #:   212-337-1859

NAME: _Nicole Whittaker_

PHONE: _212 620 8982_

OFFICE/ORG: Drug Enforcement Administration/New York Field Division

**5** Additional Comments

_Re: 292 $55,982.00_

**"NOTICE:** This is an official government communication that may contain privileged or sensitive information intended solely for the individual or entity to which it is addressed.  Any review, retransmission, dissemination, or other use or action taken upon this information by persons or entities other than the intended recipient is prohibited.  If you are not the intended recipient or believe you received this communication in error, please contact the sender immediately."

Note:  If you have any problems with this transmission (incorrect number of pages/poor quality), call the sender and request retransmission.

DEA Form 501 Fax Transmittal Sheet for Unclassified Information Only
(September 2006)                                                    EXHIBIT D

# PRIVACY ACT

AUTHORITY:    The Controlled Substances Act of 1970 authorizes DEA to seized asset under certain circumstances.  Such asset may be returned to the registered owner, or l enholder when it is determined that persons with substantial interest in the asset are not in violation of the act.

PURPOSE:    The principal purpose of the form is to carry out its responsibilities under the Controlled Substances Act of 1970 as pertains to the disposition of impounded or seized property.

ROUTINE USE::    The signed DEA-292 becomes a part of the official DEA records to document the disposition of the asset by DEA and releases DEA from any liability.

EFFECT:    The refusal of a registered owner and/or lienholder to provide data needed to complete the form and execute signature on the completed form may cause DEA to retain custody of the property described on the DEA-292.

EXHIBIT D

**U. S. Department of Justice**

Drug Enforcement Administration

New York Field Division
99 Tenth Avenue
New York, New York 10011

*www.dea.gov*

Certified Mail-Return Receipt Requested

Jose Alejandro Castillo-Medina
c/o Michel Larouche, Attorney at Law
240 rue St.-Jacques Quest, Suite 701
Montreal, Quebec H2Y 1L9, Canada

Re:   DEA Case No.:   C1-07-0278
      Asset ID No.:    08-DEA-491346
      Property Seized:  $55,980.00 U.S. Currency

Dear Mr. Castillo-Medina:

The United States Attorney's Office has advised this Office that it will not file a civil action to forfeit the above-described property. This property will be returned by the United States Marshals Service upon our receipt of a signed Hold Harmless Agreement (DEA-292).

Anyone wishing to file a claim for the return of this property must do so within 30 days of receipt of this notice and conform to the requirements cited in 41 C.F.R. 128-48.50. If claiming this property, the claimant is required to sign, date and notarize the enclosed Hold Harmless Agreement. If the property is not properly claimed within the 30 days of receipt of this notice, the property will be deemed abandoned and the title will vest (or remain vested) in the United States.

If you desire to claim this property, please send your claim to the U.S. Dept. of Justice, Drug Enforcement Administration, 99 Tenth Avenue, New York, New York 10011, Attn: Asset Forfeiture Unit, Ted Segar, Group Supervisor S-12.

Sincerely,

John P. Gilbride
Special Agent In Charge

By: Daniel S. Anderson
Associate Special Agent In Charge

EXHIBIT D

U.S. Department of Justice - Drug Enforcement Administration

## SECURED PARTY INDEMNITY AGREEMENT

*See Reverse for Privacy Act Information*

This agreement is made between Jose Alejandro Castillo-Medina
_____
(Name)                                                    (Title)

Michel Larouchem, Attorney    240 rue St.-Jacques Quest, Ste. 701, Montreal, Quebec H2Y 1
(Firm Name)                   (Address)

and the Drug Enforcement Administration of the United States Department of Justice. The
Agreement is made in consideration of the return of a   U.S. Currency
_____

$55,980.00 U.S. Currency
_____
Description of Property: i.e., year, make, model, dimension(s), identification/serial number(s)

registered to  Jose Alejandro Castillo-Medina, c/o Michel Larouchem, 240 rue St.-Jacques Q
              (Name and Address)

used in violation of Title 21 of the United States Code, and for other consideration, the receipt of
which is hereby acknowledged.
Jose Alejandro Castillo-Medina C/O Michel Larouchem, Attorney
_____
(Firm or Person Involved)

being the   Owner                                    of the property as evidenced by a

Letter                                        dated  11/20/2008
(Title, Registration, Contract, Note, etc.)

If the  $55,980.00 U.S. Currency                 is returned to the person from whom it was seized
        (description of property)

and it is seized again for a violation of the United States Controlled Substances Act, or other drug-related offense(s),
the  Jose Alejandro Castillo-Medina                may lose the innocent owner/lienholder defenses
     (name of person or entity)

typically available to such interested parties.

It is hereby agreed to unconditionally release and hold harmless the Drug Enforcement Administration, its officers,
employees and agents, from any and all claims, demands, damages, causes of actions or suits, of whatever kind and
description, and wheresoever situated, that might now exist or hereafter exist by reason of or growing out of or
affecting, directly or indirectly, the return of the above described property.

Executed in triplicate this    10th    date of  December                                   2008 .

C1-07-0278                                                13TH JANUARY 2009
(DEA Case Number)      (Signature of Person Executing)          (Date)                    SEAL

08-DEA-491346
(Asset ID)            (Signature of DEA Employee)               (Date)

Distribution
Orig. - DEA Office
Dup. - DEA HQS/DOA               EXHIBIT E
Trip. - Firm or Person

U.S. Department of Justice - Drug Enforcement Administration

## SECURED PARTY INDEMNITY AGREEMENT

*See Reverse for Privacy Act Information*

This agreement is made between Jose Alejandro Castillo-Medina

_____

(Name)                                                                                          (Title)

Michel Larouche Attorney             240 rue St. Jacques Ouest, Ste. 701 Montreal, Quebec H2Y 1

(Firm Name)                                          (Address)

and the Drug Enforcement Administration of the United States Department of Justice. The Agreement is made in consideration of the return of a  U.S. Currency

$55,980.00 U.S. Currency

Description of Property: i.e., year, make, model, dimension(s), identification/serial number(s)

registered to Jose Alejandro Castillo-Medina, c/o Michel Larouche, 240 rue St. Jacques O

(Name and Address)

used in violation of Title 21 of the United States Code, and for other consideration, the receipt of which is hereby acknowledged.

Jose Alejandro Castillo-Medina C/O Michel Larouche, Attorney at Law

(Firm or Person Involved)

being the Owner _____ of the property as evidenced by a

Letter _____ dated 11/20/2008 _____

(Title, Registration, Contract, Note, etc.)

If the $55,980.00 U.S. Currency _____ is returned to the person from whom it was seized

(description of property)

and it is seized again for a violation of the United States Controlled Substances Act, or other drug-related offense(s), the  Jose Alejandro Castillo-Medina _____ may lose the innocent owner/lienholder defenses

(name of person or entity)

typically available to such interested parties.

It is hereby agreed to unconditionally release and hold harmless the Drug Enforcement Administration, its officers, employees and agents, from any and all claims, demands, damages, causes of actions or suits, of whatever kind and description, and wheresoever situated, that might now exist or hereafter exist by reason of or growing out of or affecting, directly or indirectly, the return of the above described property.

Executed in triplicate this  12th _____ date of January

C1-07-0278 _____            _____          15ᵗʰ JANUARY

(DEA Case Number)                      (Signature of Person Executing)                      (Date)

08-DEA-491346 _____       _____          _____

(Asset ID)                                       (Signature of DEA Employee)                      (Date)

*[seal: Commissaire à l'assermentation — MYRIAM LAJEUNESSE — SEAL — MATRICULE 166 179 — POUR LES DISTRICTS JUDICIAIRES DE MONTRÉAL ET LAVAL]*

Distribution
Orig. - DEA Office
Dup. - DEA HQS/DOA
Trip. - Firm or Person

## EXHIBIT E

FORM DEA-292 (2-00) *Previous editions are obsolete.*                    Electronic Version Designed in JetForm 5.2 Version



U. S. Department of Justice
Drug Enforcement Administration

New York Division
99 Tenth Avenue
New York, New York 10011

Mr. Timothy Hogan, Chief Deputy
United States Marshals Service
Eastern District of New York
225 Cadman Plaza East (G-20)
Brooklyn, New York 11201

FEB 0 5 2009

2009 FEB -5 AM 11: 48
US MARSHALS EDNY

RECEIVED

Re:  Return of Property
DEA Case Number: C1-07-0278
Asset I.D. Number: 08-DEA-491340
Property: $55,980.00 U.S. Currency

Dear Chief Deputy Hogan:

The Drug Enforcement Administration (DEA) has been informed by the United States Attorney's
Office, Eastern District of New York that it has decided not to file a civil action to forfeit the above-
referenced property.  Subsequently, our office is requesting that your agency return the referenced
seizure to Jose Alejandro Castillo-Medina. Please make arrangements to forward the above-
referenced check to the claimant Jose Alejandro Castillo-Medina, c/o Michel Larouche, 240 rue St. -
Jacques Guest, Suite 701, Montreal (Quebec) Canada H2Y 1L9.

Enclosed is a signed copy of a Hold Harmless Agreement (DEA-292).

Should further information be required, please contact the Asset Removal Group at 212-620-6880.

Sincerely,

John P. Gilbride
Special Agent In Charge

By:  Daniel S. Anderson
Associate Special Agent In Charge

Enclosures

US MARSHALS EDNY
2009 JAN 30 PM 2: 15

RECEIVED

EXHIBIT E

Standard Form. 1034
Revised October 1987
Department of the Treasury
I TFM 4-2000

**PUBLIC VOUCHER FOR PURCHASES AND SERVICES OTHER THAN PERSONAL**

VOUCHER NO.
838

| U.S. DEPARTMENT, BUREAU, OR ESTABLISHMENT AND LOCATION | DATE VOUCHER PREPARED 02/05/2009 | SCHEDULE NO. |
|---|---|---|
| U.S. Marshals Service, EDNY<br>U.S. Department of Justice<br>225 Cadman Plaza East - Room G80<br>Brooklyn, New York  11201 | CONTRACT NUMBER AND DATE | PAID BY<br>EUGENE J. CORCORAN<br>U.S. MARSHAL, EDNY<br>8153 |
| | REQUISITION NUMBER AND DATE | |

| PAYEE'S NAME AND ADDRESS | Jose Alejandro Castillo-Medina<br>c/o Michel Larouche<br>240 rut St. - Jacques Ouest, Suite 701<br>Montreal (Quebec) Canada H2Y 1L9 | DATE INVOICE RECEIVED |
|---|---|---|
| | | DISCOUNT TERMS |
| | | PAYEE'S ACCOUNT NO. |

| SHIPPED FROM | | TO | WEIGHT | GOVERNMENT B/L NO. |
|---|---|---|---|---|

| NUMBER AND DATE OF ORDER | DATE OF DELIVERY OR SERVICE | ARTICLES OR SERVICES *(Enter description, item number of contract or Federal supply schedule, and other information deemed necessary)* | QUAN-TITY | UNIT COST | PER | AMOUNT (1) |
|---|---|---|---|---|---|---|
| | | 08-DEA-491346 | | | | $55,980.00 |
| | | USA V. U.S. CURRENCY | | | | |
| | | Return funds to claimant per letter from DEA dated 02/05/09 | | | | |

| (Use continuation sheets) if necessary | (Payee must NOT use the space below) | **TOTAL** | $55,980.00 |
|---|---|---|---|

| PAYMENT: | APPROVED FOR<br>= $ | EXCHANGE RATE<br>= $1.00 | DIFFERENCES | |
|---|---|---|---|---|
| ☐ PROVISIONAL<br>☐ COMPLETE<br>☐ PARTIAL<br>☑ FINAL<br>☐ PROGRESS<br>☐ ADVANCE | BY (2) *Linda G Rudolph*<br>TITLE  AO | | Amount verified; correct for<br>(Signature or initials) | $55,980.00 |

Pursuant to authority vested in me, I certify that this voucher is correct and proper for payment.

2/25/09 _____ Date   Authorized Certifying Officer (2)   ACDum _____ (Title)

ACCOUNTING CLASSIFICATION   15X6874 (4501)

| PAID BY | CHECK NUMBER 217923 | ON ACCOUNT OF U.S. TREASURY | CHECK NUMBER | ON *(Name of bank)* |
|---|---|---|---|---|
| | CASH | DATE 2/26/09 | PAYEE 3 | |
| | | | PER | |
| | | | TITLE | |

(1) When stated in foreign currency, state name of currency
(2) If the ability to certify and authority to approve are combined in one person, one signature only is necessary; otherwise the approving officer will sign in the space provided, over his/her official title.
(3) When a voucher is receipted in the name of a company or corporation, the name of the person writing the company or corporate name as well as the capacity in which he/she signs, must appear.  For example: John Doe Company, per John.

PRIVACY ACT STATEMENT
The information requested on this form is required under the provisions of 31 U.S.C. 82b and 82c, for the purpose of disbursing Federal money. The information requested is to identify the particular creditor and the amounts to be paid. Failure to furnish this information will hinder discharge of the payment obligation.

SF-1034
10/87
USMS 07/05

**EXHIBIT E**



15-51
000

8153-00217925

JUSTICE
U.S. MARSHAL
BROOKLYN, NY

Check No.

February 26,2009

**$55980and00/100

Pay to
the order of

Jose A. Castillo-Medina
%Michel Larouche
240 Rut St. Jacques Ouest, Ste 701
Montreal, Canada H2Y 1L9

VOID AFTER ONE YEAR

UNITED STATES MARSHAL

PURPOSE      08-dea-491346

BY

⑈8⑊532⑈   ⑆:000000518⑈:  002179254⑈

EXHIBIT E

**CERTIFICATE OF SERVICE**

I hereby certify that on 26 February, 2012, I caused the herewith attached Defendant's Sentencing Memorandum, with exhibits, if any, to be submitted on behalf of Jose A. Castillo-Medina by means of electronic filing with the Clerk of the Court through ECF, and that service on the Government will be accomplished by means of ECF automatic e-mail notification of the electronic filing to the following:

Assistant United States Attorney Carrie N. Capwell,
Office of the U.S. Attorney
Eastern District of New York


**s/ Stanley L. Cohen, Esq.**
Stanley L. Cohen & Associates, LLC
119 Avenue D, Fifth Floor
New York, N.Y.  10009
212-979-7572
212-995-5574 fax
stanleycohenlaw@verizon.net